Good morning. Good morning, and may it please the court, David Shapiro for the appellant, Yvonne Cotta, who has to reserve three minutes for rebuttal. Sentencing on a co-defendant can easily turn into a death sentence, and indeed the jail policy in this case generally forbids housing co-defendants together. Because of the obvious risk, when co-defendants ask for the same cell, the right answer is almost always no, especially when one of them is a would-be club killer, a violent skid-head, someone known to have been involved in a prison riot. A rational juror can find deliberate indifference and negligence on these facts, and the jail classification officer is going to take the extraordinary step of housing co-defendants together. Officers who check whether their defenses are at first not simply rely on a checkbox form that's completed before Mr. Carnell had even arrived at the jail and become in a position to threaten Mr. Cotta. And especially where we're dealing with a known violent individual like Mr. Carnell, is a reasonable approach to classification in housing in many, many circumstances, but not when we're dealing with someone like Mr. Carnell, and not when we're dealing with the extremely sensitive area of snitching. Snitches get snitches, as they say in jail, and for that reason there are extreme risks to putting co-defendants together and extreme disincentives to be fully forthcoming about the snitching on a co-defendant. Officer Anderson, or Sergeant Anderson here, knew that they were co-defendants. She knew that the co-defendant policy stated that co-defendants are generally not housed together. Our expert, an experienced high-level jail official, and since the policy only said generally not housed together, she followed the general rule. As Mr. Hackett, our expert on jail policy stated, even a casual reader, let alone an experienced injury and corrections officer, would recognize and understand that the policy clearly means that housing co-defendants together is completely unacceptable. Does it prohibit it categorically? No, Judge Bygand, it does not. But what it does do is, in addition to the general knowledge available to any reasonable classification officer, that this is plagued with fire, the existence of the general prohibition should put up an additional red flag. And Henderson knew that it was dangerous to house co-defendants together if they had adverse defenses, and she said she absolutely would not do that. She knew that Mr. Parnell would be charged with an assault of crime. Did she know that they had adverse defenses? She did not know that they had adverse defenses. She knew that they were co-defendants, and she knew that co-defendants with adverse defenses would pose a danger. But she affirmably said she didn't know that there was this blame involved. I mean, she didn't know that, right? That's true. She did not. She did not know it. And then there's the follow-up. She says, no, you don't need to talk to the attorney. And then there's the opportunity, if they live together, there was no red flag or anything else that would cause her to revisit that decision. So it was ultimately a very bad decision. But the question was, at the time she made it and monitored it, was there deliberate indifference? So it seems to me that's the hurdle that you need to convince us so she can get over. Understood. And I think that we do get over it in the very specific context of Stitcher, where the risks of relying on self-reliance. So she doesn't know that he's going to snitch. She doesn't know what the defenses are. And it's possible to even know what his defenses would have been at the time that she allowed them to go together. I mean, the defenses are, attorneys change. Attorneys demand that you can give them theory on your case. They may change in trial, depending on how things are. Attorneys are flexible in terms of the kinds of things you do. How does she monitor that? And how does she get to make that decision months and months and months before the trial? Right. And that's why the right answer, when two codices want to be housed together, is almost always no. Your rule just suggests that if your rule is right, the prison will have to adopt a policy that says we can never put you together, because you could always be second-guessed, even if she had gone to the attorney and the attorney had said, I don't think we're going to use a snitch defense. I don't think we're going to snitch there. I think I've got a different idea. You'd still be here. Well, it's difficult to conceive of a situation in which a competent classification sergeant would house co-defense together. Well, she defends they get housed together, and that's not the end of the story. Then they jointly have to be moved to another spot because of things going on within their particular location, and she doesn't say, okay, I'm going to move you. She goes back and actually looks at their jail records to see if there's any clues, indicators, red flags, or warnings. It's only a how can it be a deliberate indifference when she did follow the general rule, which is generally you wouldn't put them together, but that doesn't mean you can't put them together. So I'm just having trouble, unless we read their rule to say you can never put them together, and she is following the rule. She's responding to a red flag in the rule, which, you know, seems like a good thing as Mr. Hackett opined, a reasonable jail administrator would use this as a red flag and something that would require a full investigation. And although the discussion to the most part has been focused on deliberate indifference, there's, of course, also a negligence claim. I need you to hear this separately. Yes, I mean, maybe you can see a factor in the form of deliberate indifference analysis. Of course, also in the form of negligence analysis, not only is it a lower standard as is that claim, but in addition to that, comparative fault principles come into play. So while we meet the deliberate indifference standard, at least in the posture of summary judgment, our burden on the negligence claim is simply to show that a rational juror could find Sergeant Anderson 1% responsible for the offense here. It's not for a court to engage in the apportioning of fault. That is what the central jury functions. Counsel, in disagreeing with you on your deliberate indifference issue, I thought that there might be something to go forward with on the negligence claim. Should we send this back to district court, or should we send it back to state court? Well, there's also the policy practice claim, which goes along with it. Well, there's no more federal claims here. What should this court do? I think under the unique circumstances of this case, the correct course of action would be to try the negligence claim in district court, because at this point, the federal courts are knee-deep into this case. It's not a typical supplemental jurisdiction situation where the court dismisses the federal claims on summary judgment and then decides not to exercise. On the other hand, the federal district court would have to be weighing in on questions of California state law. So most of them are questions. And we're sometimes reluctant to tell California what we think they're going to think. In this case, the district court has already done that. The district court already, because there were two summary judgment orders. In the first two summary judgment orders, the district court found that there was a Monell claim that could proceed to trial, and threw out the state law negligence claim on the merits, interpreting California law, judged by me. And it's only because you think the federal judge looked up California law wrongly in the first three questions and wanted to send it back to a district judge to try it again. A fair point. At this point, however, the claim has been in federal court for four years. There's a ruling from the district court on the merits. I believe in order for that to be reversed, there has to be a ruling from this court on the merits of the negligence claim. And once the federal court has proceeded that far into the case, I think that there's a solid argument for trying it. I would also move on for a moment, if I could, to the policy practice claim, which, of course, we have. Do you have any kind of statute of limitations issues in that case? I believe there's a standing statute, so I don't believe that. In California law? I believe that's correct. That's my understanding. But, again, when the case has already been proceeding on appeal, through multiple survey judgments and rulings for four years, to start again with surveying and the whole process, I think it would have sufficient costs from a traditional economy standpoint. As I started the communications policy claim, the district court actually found a constitutional violation. And it found that that constitutional violation resulted in Mr. Cotta's death with regard to the lack of a sufficient communication policy. And it found that there was a trial claim and then decided and went back in a second ruling on reconsideration and decided that that claim was not given to defendants with sufficient notice. In fact, the complaint said that, in the Monell paragraph, that part of the policy was by failing to detect and communicate inmate violence. And the defendant's speeches, if I could quote for a moment from their assembly judgment motion, which is in the supplemental excerpt of Record 108. The plaintiff said he claimed for repeal led to the defendant's county of caves. As a custom policy or practice, that was the moving force behind the death of Cotta. Specifically, plaintiffs pledged the county of caves failed to adequately train and supervise employees, did not prolong inappropriate policies that would have prevented Cotta's death, including understaffing, and failing to detect and communicate inmate violence. It's right there in defendants' assembly judgment motion. And so it's clear that this was something that was before the district court. In this case, where was the failure to communicate? What violence did the jail fail to communicate? The difference between failure to communicate violence and failure to communicate risks of violence, which is really- Who failed to communicate the risk? Oh, I understand. I'm sorry. The bailiffs are unable to- Are the bailiffs part of the jail force? Yes, they're part of the Kings County Sheriff's Department, which is the defendant in there in his suit. And there's no evidence that there was any sort of written policy that required communication of risk with either the Sheriff's Department. And the bailiff said, and this is according to the defense attorney's opinion, he said, you've got to make sure that you build houses together back in the jail. Their response was, it's not our concern or we don't care. But why didn't the attorney go to the jail and tell them that he had concerns? Perhaps he should have. Perhaps he should have. Okay, he should have. That's very often tried. But the legal obligations that the defendants took on as the Sheriff's role for safeguarding Mr. Cotta's personal safety are independent of the obligations that others may have had on reserve to protect one another. Thanks, Mr. Judge. Can I ask a question? Of course. It strikes me that this is a case very similar to Castro. And in the Castro case, it's just an inappropriate bank case. If the judge knew his rights and had a chance to police his rights to hold a game plan that was developed by the majority of the inebriate court, and I don't see how we can do anything other than send the case back to the district court to reconsider under the new law. That's what we've done once before in a case called Morales. Because if a whole new ballgame weekend, recreate the ballgame from up here, aren't we almost in a position that we, in spite of all the time that's gone by, and I know counsel has put in hours on this appeal, and before, aren't we in a position, if Castro's implicated, and I think it is, that we would have to take the case and go back to the district court for reconsideration under Castro? I think that it would be appropriate to remand the case for reconsideration under Castro's individual claims, reverse the grant of summary judgment on the negligence claim, and on the policy practice claims. Thank you. One more question. Yes. Why shouldn't we do anything? Why shouldn't we send the whole matter back and let the district judge sort out the differences between the two? That is a possibility, too. I think that the, I'm not sure that Castro changes the standards that apply to the policy and practice claims, and it certainly doesn't change the negligence claims. I was going to say that if the judge could, since it's more wide-reaching than maybe we first thought it was, I'm sorry, I don't want to have to have it called again and send it back for another reason. I thought maybe the district court could sort that out at the beginning. If it doesn't apply, it could just re-enter its decision one way or the other. I've been a little tough about splitting, difficult splitting it because of Judge Lakuta's comment. Well, okay. I just, you see what I think? You didn't get to it. I wanted to ask you about it. Thank you. I'd like to find out how your opposition feels. Good morning, Your Honors. May it please the court. Good morning. On behalf of the County of Kings and Sergeant Jerry Anderson, and to address Your Honors' question that I'm starting on, and I don't think Castro changes in this case. No, I think Castro, and I think we all agree now with Kings v. A. Castro, we have to look at facts objectively, and the subjective element is gone. But I don't think that changes the outcome of this case. No, we've looked at it once more. I don't know if you're thrilled that we did, Senator Burke, because I'm sure you're familiar with Castro and with the ending comments that were made by Judge Lakuta indicating the greater breadth of the change, and it's a little difficult for us to sort out what it is and where it isn't. It's not a majority, is it, right? Yeah, but it's just a comment. It's a comment. They didn't have anything they told me that matters. It was just her observation. And if it's any benefit at all, then it makes it more problematic. And we have sent a case back before on this, so why should we send a whole case back? Because I think you can apply Castro to this case, and this court can apply Castro to the facts of this case, and nothing changes, because objectively, the same result that Sergeant Anderson and the county are still entitled to summary judgment, taking out the subjective element that Castro now tells us we have to do, and I think objectively, this court can uphold the district court's finding. Strictly on the objective facts, I don't think it needs to go back to the district court. You take the facts and you apply it in an analysis of the law. If the law is changed, how can we see it if the district judge would find it the same way? I'm not sure I'm saying that the district court would see it the same way I think they would. The only my point is, with this court, I think we can eliminate the subjective element of which Castro did to us, not did to us, but the result of Castro, and then this court can rule objectively on the facts that are before the court in the record. Thank you. To go to the negligence claim, and as the law states, and was also stated by Mr. Shapiro, of course, this is not deliberate in terms of standards, it's a much lesser standard. Why that, given the expert testimony and the array of facts, why wouldn't this be appropriate for trial as opposed to subjection? Your Honor, I think that the same facts that apply to the 14th Amendment actually apply to the negligence claim, too, and we have to look at the efforts that Sergeant Anderson made during our investigation of deciding whether or not to house Mr. Mullen and Mr. Barnhill in California. Your Honor, if you compare it to negligence standards, that's very different. You may have to have a district judge find that very similar negligence. I understand. That's a typical thing to judge. That appears to be a factual issue. It is a factual issue, but I think we've overcome that with the facts that... You nearly defied them that Ms. Henderson wasn't in the jail on the day in question, but she was at zero liability. I'm sorry, can you repeat that, Your Honor? Yeah, my comment is in order to determine that somebody has zero liability in a situation you would nearly defy that Sergeant Henderson was not present on the day in which the incident in question occurred. So you're trying to recommend she actually was present? She wasn't present, or she was? She was present. Of course she was present on the days in which the Americans reckoned on which of the days in which you classified them and assigned them to these jails. But I think when you go through the facts for classification, and number one, keep it in mind that it was Mr. Cotta that initiated this housing assignment through written requests, through verbal requests. Was there ever anything in the record that says Mr. Parnell says he too would like to be housed with Mr. Cotta? Not to the extent, yes, but not to the extent that Mr. Cotta was pushing for it. In a way, I realize Mr. Cotta was pushing for it, but it seems to me that there's certainly a potential factual issue given we have an expert report, we have some investigations certainly by Ms. Henderson, but whether she should have done more or whether she should have talked to a supervisor or whether given the general rule it was common sense that I was looking at the general races, these issues that I don't think are really answered. They are answered by inference, but not by actual fact. I think they are answered by actual facts. The biggest argument the plaintiffs are making in this case is she didn't look into this adverse defense issue. She did look into this adverse defense issue. Number one, the mere fact that Mr. Cotta coming to her and saying, I want to live with Mr. Barnhill, a snitch doesn't say I want to live with the person I snitched on, so that eliminates that issue from her analysis of the issue. That assumes people do all kinds of crazy stuff. First of all, they went out and apparently jointly committed the crime together, so that doesn't necessarily mean that he rationally thinks that everything is going to come to fall on him. In fact, he's hoping otherwise. I don't know why you say that she can conclude, in effect, as a matter of law, that's not appropriate. She had to throw an investigation. In fact, she did it twice. She did the second one seven months after they had been living together peacefully with no problems, no issues. Both investigations, she looked at their jail files, their jail records, and in those records, Mr. Cotta responded. He didn't anticipate problems with anyone. He'd never been a conformant. He'd never provided any criminal activity against anybody. He's telling her, I'm not a snitch. They have to rely on information provided by inmates. The jail policy generally allows co-defendants to be housed together. The expert says the jail policy is in compliance with Title 15 and exception standards and law for corrections. Nobody says you can't house co-defendants together. The investigation that Sergeant Henderson did, again, information she received from Mr. Cotta, her investigation, the end of the list is going to go that Ms. Henderson did look into the adverse defense problem. So, is that just because she asked Cotta what he was going to get sent to? Is that her looking into an adverse defense problem? Right. And maybe they should have worded that somewhere clearly like that. She did look at that issue. She did say, I'm going to look at this adverse defense issue. She looked at those issues related to adverse defense by, have you been a snitch? Have you been an informant? Have you given information against other inmates? Are you going to have any problems with inmates? And Mr. Cotta told her, no. If you say this is the supervisor and the executor said, I see that you're going to put these two guys together. You realize that these guys are co-defendants. She said, yes, I'm well aware of that. And her supervisor had said, well, you know, we get problems every once in a while, but okay, I see where you're coming from. How confident are you that we won't have any problems with these two? And she said, I've got a 99% confidence level. So, I guess it compared to negligence. I can't tell you what percentage she would put on that. I'm giving you a hypothetical. If Ms. Henderson says, I'm the supervisor, I'm 99% confident in my decision. If you can be a supervisor, that's good enough for me. It's hard to demand a whole lot more decision when we're trying to do good things. But would that be enough under California law to get us to comparative negligence? I don't know that that's a difficult question to answer because I can't say that she acted unreasonably. She had a duty to Mr. Melvin. Did she act unreasonably? Did she breach that duty by acting unreasonably? I don't think she did. You know, the comparative negligence can be a wondrous thing and it allows juries to sort of split the baby. And there's that possibility that she might have been 100% negligent. Which is to say, not particularly. This was nearly scientific. But under a comparative negligence regime, it's on behalf of the jury to make that decision. I don't think so, Your Honor, because I think she did what a reasonable officer under these circumstances would do. You know, someone who would have been a bigger part of poll calls and experts, poll calls to ensure that she, the evidence is clear. It's not disputed that based on the information she had, she was reasonable in housing Mr. Cardell and Mr. Cotta together, including the affirmation and, you know, and since we discounted so much, the affirmation from Mr. Cotta himself making multiple requests to live with Mr. Cardell, saying I'm friends with Mr. Cardell. The history between them, there had been no problems with Mr. Cardell. The seven-month review of another investigation. The Chief almost went further than the first investigation. She called jails and prisons where they'd been incarcerated in. She looked at all the jail records. She did what a reasonable officer would do. I don't think she did anything wrong. Can you address the communication claim first from a procedural standpoint where you think it stands and then second as a matter substantively under the McDowell Doctrine? The lack of internal communication? Yes. The jail and the... Right. Our position on that is that issue was never raised. It was never raised in the complaint. It was... The complaint was good enough to get past the pleading stage, which is a fairly low standard to get past the pleading stage, but then we need to discover what theories are you going to base this last on and what facts are you going to base those theories on? And we've outlined in our briefs the interrogatories we asked and the responses to those interrogatories. And I think the interrogatories are in some of my other excerpts for records 7 to 11. The response is in the opening brief is verbatim. Nowhere we ask what opinion or what policies you're basing this last on. Jails hold facts on those policies. Prisoners hold those policies. Nowhere does it say anything about the county failing to have a policy for staff to relay information for the benefit of human safety. So in your view, the Manel thing is limited to the co-housing issue? Yes. It had to put policy on that? The lack of internal communication was never raised as an issue in the pleadings, in the discovery responses, in the experts reports that were raised as an issue. And I think So it just comes up that district court somehow inserts it into the litigation? Exactly right. And here's the smoke you've got on it. Nowhere in the opposition to our motion for summary judgment do the plaintiffs raise that issue. Nowhere do they say, well defendants did not address this issue of a lack of intercommunication policy. Therefore the motion should be denied. That issue was never raised in opposition and it was never raised because it was never issued. And yes, that was an issue the district court came up with and convinced by way of our motion for reconsideration. But also I think what's interesting on that claim is even if it were considered, I think we're entitled to summary judgment on that claim because there is no evidence that the county lacks such a policy. The court cited Sgt. Anderson's testimony where she talks about court personnel bringing information to her and other people bringing information to her including attorneys, including the bailiffs, including the inmates themselves. And there's no evidence that in this case bailiffs did not bring that information to somebody. There's no evidence they didn't tell anybody but that's not the point. The point is maybe a bailiff dropped the ball in this case but that doesn't mean there's a lack of a policy. There is a policy. It was never raised by the plaintiffs in pleadings of discovery, opposition to motion for summary judgment. And I have three seconds left, Your Honor. Any other questions? Thank you. Thank you, Your Honors. It's right here in defendant's summary judgment brief supplemental excerpts of record 108. They're describing them in how plain they say including understaffing and failing to contact and communicate inmate violence. Similar language appears in the complaint. The interrogatory response was not sufficient but the key slide is unanimous and in the second amendment complaint on failure to communicate doesn't say anything about failure to communicate between people who are in the courtroom and people who are at the jail. It's all in the context of the failure to discover his body at night. That's what we're talking about. It's only, there's anything that connects this with anything with bailiffs. I'm looking at paragraph 30 of the second amendment complaint. Right. And it doesn't refer to bailiffs, that's true, but I believe it refers to communications within the county and the sheriff's department. The bailiffs are sheriffs. Well, it is a failure to detect and communicate. So the detection would not have had anything to do with the bailiffs if they were going to detect anything. That's true. And so failing to detect and communicate inmate violence, since there's no factual content for that in the second amendment complaint, how do we get there when there's nothing in here about bailiffs in my summary? Well, it's true that the second amendment complaint does not refer to bailiffs, but how do you get there to respond to your question is twofold. The first part is that I don't know what communicating inmate violence would mean in the context of this. Is something different from communicating inmate violence? Well, there is something different in the experts report going through all the tapes on the time in which they went past themselves to see whether all the inmates were present in the county court still breathing. So there was quite a bit of evidence, quite a bit spent on that problem. I don't associate any of the complaints that would be a hint a little bit on the problem with bailiffs. I do understand how that discussion of monitoring and its insufficient failure to monitor, I don't see how that provides an alternate meaning for the phrase communicate in the complaint. However, the fact that the bailiffs were failed to communicate it became clear in the deposition of the criminal defense attorney and the law is settled that when facts come to light that flesh out a complaint you don't have to amend the complaint to add the new facts as they're available to all parties as they were through the deposition. Any other questions? Okay, thank you.
judges: Wallace, McKeown, Bybee